

FILED
2021 May-20  PM 12:42
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ALABAMA, NORTHEASTERN DIVISION

| | |
|---|---|
| **BRANDIE  ROBINSON,** ) | |
| **as personal representative of** ) | **Jury Trial Demanded** |
| **the estate of Crystal Ragland, deceased** ) | |
| ) | **CASE NO:** |
| **PLAINTIFF** ) | |
| ) | |
| **V.** ) | |
| ) | |
| **CITY OF HUNTSVILLE;** ) | |
| **FICTITIOUS DEFENDANT POLICE** ) | |
| **OFFICER A, whose identity is not currently** ) | |
| **known and who will be named later;** ) | |
| **FICTITIOUS DEFENDANT POLICE** ) | |
| **OFFICER B,  whose identity who is not** ) | |
| **currently known and who will be named later** ) | |
| ) | |
| ) | |
| ) | |
| **DEFENDANTS** ) | |

## **COMPLAINT**

COMES now the Plaintiff, Brandie Robinson, in her capacity as the person representative of the estate of Crystal Ragland, deceased, who alleges the following facts, asserts the following causes of action, and seeks to recover the following damages against Fictitious Defendant Police Officer A, Fictitious Defendant Police Officer B, and the City of Huntsville

## **Parties, Jurisdiction and Venue**

1. The decedent, Crystal Ragland, a United States Army Veteran, was 32 years old time at her death on May 30,2019. She was a resident and citizen of Huntsville, Alabama which is located within the jurisdiction of Madison County, Alabama.

2. The Plaintiff, Brandie Robinson, is over the age of nineteen years, and a resident and citizen of Madison County, Alabama, She is the personal representative of the estate of Crystal Ragland, deceased, having been appointed on the 29th day of September, 2020 by the Probate Court of Madison County (Case No 71638).

3. The Defendant, the City of Huntsville, is an Alabama Municipal Corporation that duly organized the Huntsville Police Department (referred to throughout the complaint now as "HPD") and authorized its policies, procedures, customs and practices which govern the duties and actions of its police officers. The City can be served through , its City Clerk, at 308 Fountain Circle (City Hall), 3rd Floor, Huntsville, Alabama 35801.

4. The Defendant, Fictitious Police Officer A (also referred to as "HPD Officer A" throughout)  is a resident and citizen of Madison County, who was working in the line and scope of his employment as a police officer with the City, by and through the "HPD", on May 30, 2019.   All of HPD Officer A's actions set forth

in this complaint were done within the course and scope of his employment with the City, and under color of Alabama State Law.  HPD Officer A is being sued in his individual and official capacity.

5. The Defendant, Fictitious Police Officer B (also referred to as "HPD Officer B" throughout) is a resident and citizen of Madison County, ho was working in the line and scope of his employment as a police officer with the City, by and through the "HPD", on May 30, 2019.  All of  HPD Officer B's actions set forth in this complaint were done within the course and scope of his employment with the City, and under color of Alabama State Law. HPD Officer B is being sued in his individual and official capacity.

6. This court has subject matter jurisdiction over Count 1 pursuant to 28 U.S.C. 1331 because it alleges violations of the United States Constitution and 42 U.S.C. 1983. This Court has supplemental federal jurisdiction pursuant to 28 U.S.C. 1367(a) over Count 2, which asserts any applicable pendent state law claims.

7. Venue is proper in this division and district under 28 U.S.C. 1391 (b) (2) because a substantial part of the events or omissions giving rise to the claim occurred in this  division and district. Venue is also proper in this division and

district pursuant to 28 U.S.C. 1391 (b)(1) and (c)(2) because both HPD Officers A and B and the City reside in this division and district under the meaning of this statute.

8.  This is a wrongful death case resulting from Huntsville Police Department ("HPD") officers (HPD Officer A and HPD Officer B) shooting and killing Crystal Ragland.  The Plaintiff will identify these officers in an amended complaint relating back to this complaint.

9.  The  City has repeatedly failed and refused to address widely known systemic deficiencies regarding the use of force by HPD police officers for many years.

10. While the City had written policies and procedures prohibiting the use of excessive force, the City also had an unwritten custom and practice for years prior to the subject May 30, 2019 shooting incident, of refusing to discipline and hold accountable officers who use unconstitutional, excessive and/or unskillful force in the line of duty, whether by shooting or otherwise.

11. Specifically, the City established a "Board" which ostensibly gave the appearance that the City was allegedly closely examining and reviewing each instance of force resulting in serious injury or death.

12. During the many years preceding this subject shooting death on May 30, 2019 the "board" almost always determined that the officer's force was proper and acceptable, even when the officer violated policy and/or used excessive, unconstitutional, and/or unskillful force. Upon information and belief, the supervisors of the board were rarely, if ever, critical of an HPD officer's use of force, and even then, no real discipline, education, or training was ever imposed.

13. Instead, the City controlled the "board", not only by having the City Attorney's Office sit on the meetings , but more importantly by restricting all decisions. to three HPD supervisors picked by the HPD Chief of Police. Although the Madison County's District Attorney's Office and the Citizens Advisory Council are considered part of the "board", this appears to be in name only as neither are involved in any discussion or determination as to whether an officer violated policy or used excessive, unconstitutional, and/or unskillful force, and neither is entitled to vote or have any say in whether officers should face disciplinary action ore receive more education and training.

14. During the many years preceding this subject shooting death on May 30, 2019, the three supervisors almost always determined that the officer's force was proper and and acceptable, even when the officer violated policy and/or used

excessive, unconstitutional, and/or unskillful force. Upon information and belief , the three supervisors were rarely, if even critical of an HPD officer's use of force, and even then no real discipline, education, or training was ever imposed. [1]

15. In so doing, the City established a custom or practice of condoning excessive, unconstitutional, and/or unskillful force -- a custom and practice that all HPD officers knew would always protect them if they used excessive, unconstitutional, and/or unskillful force.

16. Because of this custom and practice, the HPD officers subjectively believed, and had good reason to believe, that they would never suffer any negative consequences for using excessive, unconstitutional, and/or unskillful force, including excessive, unconstitutional, and/or unskillful deadly force. Thus, the custom and practice resulted in encouraging HPD officers to use excessive, unconstitutional and/or unskilled force.

17. The City was subjectively aware of the risk of harm of such a custom and policy but explicitly or implicitly allowed custom and practice to continue. The City and its governing officials knew this custom and practice created a

_____

[1] See  Vance Stone v. City of Huntsville. 5:16-220  for one example where board was critical of HPD officer use of force but no real discipline, education or training was ever imposed.

substantial risk of serious harm, and the deprivation of constitutional rights, to residents, citizens, and guests in Madison County. They also knew the continuance of the custom and policy would result in the infliction of unnecessary pain and suffering by those who interacted with the HPD. They were on notice that their custom and practice from complaints, communications from correctional officers, from their own observations from common sense , from other injuries and death, from other lawsuits and by other ways. Some (but not an all inclusive list) of prior instances are as follows.

18.  We start with the incident involving Jeffery Parker that occurred on April 3, 2018  just over a year prior to the incident involving Crystal Ragland. [2] Parker called 911 and reported that he was suicidal.  Two senior officers responded to this call and were by all accounts de-escalating the situation.  Officer Ben Darby, who was en route to the precinct, heard the call and rushed to the scene. Darby, completely ignorant of what was going on inside and the efforts and progress of the initial responding officers, pushed past those officers and inserted himself between them and Parker. Within 11 seconds of entering the house Darby shot Parker in the mouth despite Parker not making any threatening movements.

---

[2] see case number 5:20 CV-430-LCB- Martinson v. Darby, HPD.

19. Immediately after the shooting, Huntsville Mayor Tommy Battle and the HPD Chief McMurray began a media campaign/blitz supporting Darby which has continued through  the internal review board clearing Darby, the subsequent indictment and recent conviction on May 7, 2021.

20. In fact Darby's actions were not only ratified by the HPD and Mayor Battle but also the City Council which in an unprecedented measure authorized at least $125,000 in City money to defend Darby.   Councilwoman Jennie Robinson stated that paying for Darby's defense "sends a message" that the City "supports" the local police force".  Post-conviction, the Mayor and the HPD Chief have further doubled down on supporting Darby and have gone as far as criticizing the District Attorney for bringing forward the case as well as the the jury's verdict.

21. At least one Huntsville City Council member has retroactively indicated that the city made a mistake in authorizing the paid defense of Darby by the fact that they did not view the video footage prior to voting on that expenditure.

22. Furthermore, it is widely known that the two original responding officers in the Darby case were sent to remedial training. [3]

---

[3] Compare this to the Stone case where an officer who committed what amounts to be an assault on an individual in custody and receiving medical treatment.

23.  The City's position of treatment of mentally ill individuals has seemingly

evolved into one that requires quickly escalating police-citizen interactions

without trying to first deescalate the situation.


24. Besides the Parker shooting there have been numerous instances of excessive

force committed against individuals by the HPD[4].  Upon information and

belief, the three HPD supervisors found that the HPD officers acted

appropriately in all of these instances.


25. It was well known to HPD officers, including , that the City had a custom and

practice of allowing its officers to use excessive, unconstitutional, and/or

unskillful forced. The HPD officers, including Darby, had this knowledge from

the incidents described above, from other similar incidents that occurred over

the years, from their conversations with each other and with their superiors,

through their daily observations regarding how HPD officers used force, and in

other ways.


26. On May 30, 2019 , two unidentified officers at this time which are "HPD

Officer A" and "HPD Officer B" were dispatched to Stadium Apartments at the

---

[4] See *Martinson V. Darby, et.al* - statement of facts 17-21; See also *Sampson V. City of Huntsville*  5:13
CV 2161 - strip search case from 2013

3200 Block of Westheimer Drive in Huntsville, Alabama based on a 911 call or series of 911 calls about an erratic individual named Crystal Ragland who may have been armed.  It is believe that these unidentified officers will easily be identified from the video, as the only two initial responding officers,  which has not yet been shown to current Plaintiff's counsel. [5]

27.  It is alleged that the initial 911 call from the apartment complex manager indicated that Ragland suffered from PTSD, schizophrenia and/or other mental impairments.

28.  It is further alleged that the responding officers knew or should have known that Ragland was suffering from a mental illness based on the original 911 call and other statements that were made when they arrived at the scene of the incident.

29.  Within a minute of officers arriving at the apartment of Crystal Ragland and knocking on her front door that she was struck by multiple gunshot wounds from "HPD Officer A" and/or "HPD Officer B" and later died. It is unclear

---

[5] An attorney for the City had indicated that they would provide the names of the officers prior to suit being filed but have not yet done so as of the date of filing.  It is believe that the City will voluntarily provide these names in the near future and the complaint will be amended

what verbal commands were made or what discussions were had with the officers and Ragland.

30. News reports of the incident describe the incident as seconds-long, some reports state 3 seconds specifically and that Ragland repeatedly shouted "shoot me" at the responding officers.

31. Crystal Ragland never fired any shots at responding officers. Officers contend that Ragland was armed although that fact seems to be in dispute. News accounts of the incident said that Police stated Ragland said did not have a gun.

32. Deseree Montgomery, a woman who said she saw police shoot Ragland, told news reporters "that she didn't see Ragland with a gun or notice on one the ground after the shooting.".

33.  HPD Officer A and/or HPD Officer B did not provide any deescalation techniques or utilize any CIT or other mental illness training to calm down or check on Ragland despite knowing or should have known that she suffered from mental illness.

34. An HPD internal review board cleared the Huntsville police officers as related to the Ragland matter in June of 2020. No charges were presented to a grand jury in this matter.

35. The City has refused to release to the public the body camera videos. Some redacted reports have been released to the media.

36. Crystal Ragland was a mentally ill veteran who was diagnosed with PTSD, schizophrenia and other mental disorders.

37. Crystal Ragland was a beloved member of her family and a decorated military veteran who received accommodations for her conduct and medals include: a National Defense Service Medal , and Global War on Terrorism Service Medal.

38. Crystal Ragland's military separation was combat related.

39. The City has failed to fully implement mental health procedures even after the failures that occurred in the tragic Jeffery Parker case just a year earlier.

40. Since 2015, studies have shown that a nearly a quarter of all people killed by police officers in America have had a known mental illness.

41. Several police involved shootings in the Huntsville/Madison County area have involved individuals with a known mental illness.

42. Cases where mentally ill individuals are injured by the police are common although tracked less meticulously.

43. Despite this widespread knowledge, the City of Huntsville and the HPD have been reluctant to change their response to dealing with mentally ill individuals.

44. The HPD has seemingly taken approach of ratifying aggression and escalation as the preferred approach to mental health crisis instead of deescalation.

45. Even by adopting the Crisis Intervention Team (CIT) approach dealing with mentally ill individuals the HPD has just checked the box and simply goes through the motions in terms of utilizing this model.

46. In fact it is not clear in the Ragland incident whether a CIT was even discussed and/or utilized or if the responding officers were CIT trained or certified.

47. As of May of 2021 it is believed that only 75 Huntsville Officers are fully CIT

certified. It is believed that number would have been much lower in 2019 at the

time of the Ragland shooting. Huntsville employs nearly 500 officers so

essentially only 15% of the HPD is CIT certified at the current time.

48. Had Huntsville fully adopted deescalation, the CIT model or alternative

mental health responses, Crystal Ragland would not have been shot and killed.

49. Even since the Darby and Ragland cases, the City of Huntsville has been

widely criticized for excessive force and other unconstitutional violations being

committed by the Huntsville Police Force.

50. On April 22, 2021 a report was issued by independent counsel regarding the

events of June 1 and June 3, 2020.[6]

51. Independent counsel noted that "the City Council should require a greater

transparency from the HPD" on page 17 of the report.

---

[6] See Independent Counsel report issued by Elizabeth H. Huntley and Jackson R. Sharman of Lightfoot, Franklin and White. This report is available online at huntsvillepolicereview.com   This has been classified as a systemic review rather than that of individual officers.

52.  The Crystal Ragland death was briefly mentioned in the Independent Counsel
report as having a disproportionate effect on Madison County landscape on
page 20 of the report. The report noted that "an internal MPD review found
that the officers acted consistently with HPD polices."

53. The Independent Counsel notes that they were unable to interview Huntsville
Police Officers as it pertains to the events that it occurred in June of 2000.
They specifically noted that "the review of the civil unrest last summer is the
only one of which we are aware where the investigators requested but were not
allowed to speak with the law enforcement officers "on the ground" and
involved in the events. This lack of transparency was and remains troubling; is
based on an unwise policy and questionable legal analysis by the City and
HPD; and is inconsistent with the letter and spirit of the resolution. "[7]

54.  While the scope of the Independent Counsel covers a time period that occurred
over a year after the Ragland incident,  the analysis of the use of force policies,
training and general HPD disposition is extremely helpful to understand the
history as it relates to HPD policy as well as implementation as it relates to use
of force and other trainings.

---

[7] See page 40 of the Independent Council report

## CAUSES OF ACTION

## COUNT 1: EXCESSIVE FORCE UNDER 42 U.S.C. 1983 AGAINST ALL DEFENDANTS

55. Each of the paragraphs of the Complaint is incorporated as if fully restated herein.

56. This cause of action brought against HPD Officers A and B and the City pursuant to 42 U.S.C. 1983, the Fourth Amendment, 42 U.S.C 1988, and the Alabama Wrongful Death Act. Ala. Code 6-5-410. Plaintiff incorporates by reference all factual allegations in the preceding paragraphs.

57.  HPD Officer A,  while acting under color of law, deprived Ragland of her Fourth Amendment right to be free from excessive or unreasonable force during an arrest or seizure.

58. As described above, HPD Officer A subjected Ragland to excessive and unreasonable force when she was shot multiple times.  Ragland did not pose an immediate threat of harm to HPD Officer A, HPD Officer B, or any other officers.  In fact, she was in her own apartment when the officers arrived. No reasonably prudent officer, face with similar circumstances, would have acted as HPD Officer A or HPD Officer B acted.

59. HPD Officer A and HPD Officer B's unconstitutional and excessive acts of force against Ragland were done with reckless indifference and a callous disregard of Ragland's Fourth Amendment rights.

60. Moreover, HPD Officer A's use of excessive force was caused, in part by the unconstitutional and deliberately indifferent customs and practice of the City as set forth above. These 1983 claims against the City are not brought pursuant to the doctrine of respondeat superior, but pursuant to *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 694 (1978) and its progeny, because the City had a custom and practice that constituted a deliberate indifference to Ragland's constitutional rights that was the moving force behind Ragland's unconstitutional and excessive use of deadly force.

61. The City and its HPD supervisors and policymakers subjectively knew that their customs and practices in failing to discipline and/or educate previous officers use of unconstitutional and excessive force would result in more instances of excessive force, serious injury, harm, and/or death. They were not only aware of the facts form which these conclusions could be drawn, they in fact each subjectively drew such conclusions. Nevertheless, they disregarded

the risk to those like Ragland who encounter HPD officers, and in so doing they acted with more than gross negligence.

62. They also ratified unconstitutional conduct as set forth above. In fact the City in essence advocated and rewarded unconstitutional conducted by paying for the defense of Officer Darby and advocating for his innocence, even after a Madison County Jury found him guilty of murder,   as outlined in the statement of facts.

63. The City's unconstitutional policies were the driving force behind  HPD Officer A and Officer B's unconstitutional and excessive force. As a direct and proximate result of the combining and concurring unconstitutional conduct of the responding officers and  the City,  Ragland suffered from multiple gunshot wounds and died.

WHEREFORE, PREMISES CONSIDER, Plaintiff respectfully requests the Honorable Court (1) to enter judgment against HPD Officers A and B and the City (2) to award him, in an amount determined by the jury, either (a) punitive damages pursuant to Ala Code 6-5-410 for the death of Crystal Ragland or (b) compensatory damages arising out of her death according to federal common law remedy,

including, but not limited to, lost wages and benefits, and future earning capacity;
(3) to award her attorney fees, expert witness fees, court costs, and interest as
allowed by law; and 4) specific injunctive relief as it applies to forced reform of
internal City of Huntsville Police Department Review boards , makeup of that
board and oversight of that board and 5) to award her all other relief as the Court
deems proper.

## COUNT TWO: COMMON LAW NEGLIGENCE AND WANTONNESS AGAINST ALL DEFENDANTS

64. Each of the paragraphs of this Complaint is incorporated as if fully related
herein.

65. This cause of action brought against HPD Officer A, HPD Officer B and the
City pursuant to the common law of the State of Alabama, Ala. Code
11-47-190, and the Alabama Wrongful Death Act, Ala. Code 6-5-410. Plaintiff
incorporates by reference all factual allegations in the preceding paragraphs.

66. HPD Officer A negligently and/or wantonly shot Ragland in violation of a(1)
the standard of care applicable to police officers (2) the specific, mandatory
and non-discretionary duties prescribed by the HPD for performing his work

(3) failure to undergo mental health specific training and (4) the Fourth Amendment to the U.S. Constitution.

67. In so doing, HPD Officer A and HPD Officer B acted with neglect, carelessness, or unskillfulness and/or acted willfully, maliciously, in bad faith, recklessly, beyond his authority or under a mistaken interpretation of the law.

68. HPD Officer A and HPD Officer B were acting in the line and scope of his employment with the City, making the City vicariously liable under the doctrine of respondeat superior and Ala Code 11-47-190 for his negligent careless, and unskillful use of force.

WHEREFORE PREMISES CONSIDERED, Plaintiff respectfully request this Honorable Court: (1) to enter judgment against HPD Officers A and B and the City (2) to award her in in an mount determined by the jury , punitive damages pursuant to Ala. Code 6-5-410 for the death of Crystal Ragland 3) to award court costs, and interest as allowed by law; and 4) specific injunctive relief as it applies to forced reform of the  internal City of Huntsville Police Department Review board, makeup of that board and oversight of that board 5) to award her all other relief as the Court deems proper.

## COUNT THREE: MONELL LIABILITY INADEQUATE POLICY
## AGAINST CITY OF HUNTSVILLE

69. Each of the paragraphs of this Complaint is incorporated as if fully related herein.

70. At all times material herein, the City had a legal duty to adopt and implement rules and procedures to ensure that its police force appropriately restrain citizens in a manner which is safe to all parties and necessary under the circumstances specifically as it applies to mentally ill citizens.

71. This duty included, but was not limited to the duty to create, adopt, and implement rules, regulations, practices and procedures which clearly direct police officers as to the appropriate use of force under relevant circumstances specifically as it applies to mentally ill citizens.

72. The City's failure to adopt appropriate treatment of mentally ill individuals involved in police encounters amounts to deliberate indifference under 1983 as discussed in *Monell.*

73. Furthermore, by ordering two officers to remedial training in the Darby case, the City has essentially taken the position that they train to shoot in all

situations in which they believe a citizen to be armed regardless if that individual possesses any immediate threat or danger.

74.  By taking a position that aggressive interactions are preferred over deescalation the City of Huntsville sent a message to officers that they could in fact face consequences for trying to deescalate situations.

75. The City has by custom and practice changed their internal standards to be different than the national standards of what is considered reasonable force. This approach and position conflicts with criminal and civil laws and is inconsistent with national standards.

76. The city knew or should have known that the failure to establish a custom, policy or practice regarding proper use of force under relevant circumstances would result in repeated instances of excessive force by reason of carelessness, recklessness, deliberate indifference, or other culpable conduct.

77. As a proximate cause of the City's deliberate indifference , Crystal Ragland suffered multiple gunshot wounds and died.

78.  Again while outside the scope in terms of the time period, the Independent Counsel report of the June 2020 events gives us an insight into the City's years of failed policies and implementation as it applies to excessive force and training specifically. This report is helpful to understand a *Monell* liability analysis.

79.  Plaintiff seeks compensatory and punitive damages, costs, attorneys' fees, interest, and any other relief allowed under Alabama law.

Wherefore, premises considered, the Plaintiff seeks the following relief

a) an award of compensatory and punitive damages in an amount to be determined by a jury

b) an award of court costs, interest, and reasonable attorney's fees as provided under 1983 and

c) specific injunctive relief as it applies to forced reform of  the internal City of Huntsville Police Department Review board, makeup of that board and oversight of that board

d) any other relief which is found to be proper under the circumstances.

## **Jury Demand**

Plaintiff requests a trial by jury on all factual issues, including damages.

Respectfully submitted,


/s/ Martin Weinberg

Attorney for Plaintiff

PO Box  154 Shannon, AL. 35142

Phone 205-910-3722

Fax 205-413-8717

attorneyweinberg@bellsouth.net


/s  Richard Rice

Also Representing Plaintiff

The Rice Firm LLC

420 20th Street North Suite 2000

Birmingham, AL. 35202

205-618-8733

rrice@rice-lawfirm.com


REQUEST FOR SERVICE BY CERTIFIED MAIL

Plaintiff requests the Clerk to immediately issue a summons for each of the following defendants so they can be served by certified U.S. Mail pursuant to F.R.C.P. 4(e)(1) and A.R.C.P 4(i)(2)..

CITY OF HUNTSVILLE

c/o Kenneth Benion, City Clerk Treasurer

208 Fountain Circle (City Hall) 3rd Floor

Huntsville, AL. 35801