# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# NORTHEASTERN DIVISION

| | |
|---|---|
| **BRANDIE ROBINSON, as personal representative of the estate of Crystal Ragland, deceased,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**CITY OF HUNTSVILLE, et al.,**<br><br>**Defendants.** | Civil Action Number<br>**5:21-cv-00704-AKK** |

## MEMORANDUM OPINION

Brandie Robinson filed this lawsuit as the personal representative of the estate of Crystal Ragland, who died after she was shot by officers of the Huntsville Police Department. The tragic incident occurred when law enforcement received a call that Ragland was threatening her neighbors with a weapon. When the officers arrived, they learned that Ragland had pointed a firearm at the manager of her apartment complex and others. They were also informed that Ragland was a veteran suffering from post-traumatic stress disorder, was not stable, and had engaged in erratic behavior for the last few weeks. When the defendant officers, Brett Collum and Jonathan Henderson, ultimately encountered Ragland, they ordered her to get her hands up, but she instead reached for a pistol she had in her pocket and grasped its handle. The officers fired their guns in response.

Robinson, acting as the representative of Ragland's estate, initially filed this lawsuit against the City of Huntsville and two unnamed officers for alleged violations of the United States Constitution and Alabama law. Doc. 1. After Robinson received and reviewed bodycam footage, she amended her complaint in part to specifically name Officers Henderson and Collum as defendants. Doc. 18. Robinson filed a second amended complaint adding Huntsville Apartment Group as a defendant and asserting a claim against it for breach of contract (Count IV). Doc. 24. Huntsville Apartment Group has yet to appear.

Relevant to the motions before the court are Counts I-III of the second amended complaint, which assert claims against the officers and the City of Huntsville under 42 U.S.C. § 1983 and Alabama law for Ragland's death. Doc. 24. The officers and the City have moved to dismiss all claims against them under Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief may be granted. Docs. 30, 31. Robinson opposes the motions, arguing that whether the officers acted lawfully, and thus whether the defendants are liable under § 1983, is an issue that should proceed to discovery. Doc. 41. Basically, Robinson maintains that the officers should have utilized de-escalation techniques, and that although Ragland reached for her firearm, the officers should have waited to see if she would point the firearm at them before firing their weapons. The case law holds otherwise, and binding precedent instructs that "it is [] constitutionally reasonable for an officer to

use deadly force when he has probable cause to believe that his own life is in peril." *Robinson v. Arrugueta*, 415 F.3d 1252, 1256 (11th Cir. 2005).  And contrary to Robinson's contention, "[t]he law does not require officers in a tense and dangerous situation to wait until the moment a suspect uses a deadly weapon to act to stop the suspect."  *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 821 (11th Cir. 2010) (citing *Long v. Slaton*, 508 F.3d 576, 581 (11th Cir. 2007)).  Therefore, for the reasons below, the defendants' motions, which are fully briefed, including a surreply by Robinson,[1] are due to be granted.

## I.

A pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Since plaintiffs often must draft complaints without the benefit of discovery, this rule does not require plaintiffs to plead "detailed factual allegations" fully outlining the merits of their case. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  But in order to survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations omitted).

---

[1] Although surreplies are generally disfavored, *see First Specialty Ins. Corp. v. 633 Partners, Ltd.*, 300 F. App'x 777, 788 (11th Cir. 2008), and the court denied Robinson's first motion for leave to file a surreply, docs. 44, 46, the court has read and considered her surreply, which she filed with her first motion for a surreply, in ruling on this motion.

A complaint states a facially plausible claim "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. "This standard 'calls for enough fact to raise a reasonable expectation that discovery will reveal evidence' of the claim." *Jackson v. JPay, Inc.*, 851 F. App'x 171, 172 (11th Cir. 2021) (quoting *Twombly*, 550 U.S. at 556). Importantly, where video evidence contradicts the plaintiff's pleaded factual allegations, courts must view the facts "in the light depicted by the videotape." *Scott v. Harris*, 550 U.S. 372, 380-81 (2007).

## II.

The tragic facts here – as alleged in the complaint and as depicted in the officers' bodycam footage – began when Officers Henderson and Collum responded to "a 911 call or a series of 911 calls about an erratic individual named Crystal Ragland who may have been armed." Doc. 24 at ¶ 26. When Officer Henderson arrived at the apartment complex where Ragland lived, the apartment manager told him that "as I came down here after I called [911], and walked through here, she had a handgun in her hand and pointed it at me." *Id*. at ¶ 27; doc. 32, Exhibit A - Henderson Bodycam Footage, at timestamp 8:39:52-8:40:00.[2] The apartment

---

[2] Robinson argues that consideration of the officers' bodycam footage converts this motion into a motion for summary judgment. Doc. 41 at 5-7. The Eleventh Circuit has adopted the "incorporation by reference" doctrine, by which "a document attached to a motion to dismiss may be considered by the court without converting the motion into one for summary judgment [] if the attached document is: (1) central to the plaintiff's claim; and (2) undisputed." *Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002). Here, the second amended complaint references the

4

manager also told Henderson that "one of our tenants just came in right before I called, said that she was pointing a gun at people." Docs. 24 at ¶ 27; 32-A at 8:40:06-8:40:12.  He then shared with Henderson that Ragland was a veteran suffering from chronic PTSD and a traumatic brain injury, that she was "not stable," and that "for the last few weeks, every time I've been down here, she's been . . . just staring out the window looking at people."  Docs. 24 at ¶ 28; 32-A at 8:40:20-8:40:45.  Shortly thereafter, Officer Collum arrived on the scene, and the apartment manager repeated that "I just walked by and she did the same thing to me, pointed the gun at me."  Doc. 32-A at 8:41:30-8:41:35.

The officers then walked towards Ragland's apartment.  As they did, Henderson informed Collum that the apartment manager had relayed that Ragland "did have a handgun and pointed it at him" and that she had "chronic PTSD and some issues like that."  *Id*. at 8:41:39-8:41:49.  Henderson drew his weapon and asked the apartment manager, who was standing behind the officers, "Was it just a handgun?"  *Id*. at 8:41:49-8:41:51.  The apartment manager replied, "That's all I saw, I don't know what else she's got in there."  *Id*. at 8:41:49-8:41:57.

---

officers' bodycam footage repeatedly, *see* doc. 24 at 1 n.1, ¶¶ 26-39, and the authenticity of the footage is not challenged, *see Horsley*, 304 F.3d at 1134.  Therefore, consideration of the footage at this stage is proper.  *See McDowell v. Gonzalez*, 820 F. App'x 989, 992 (11th Cir. 2020) (citing *Horsley*, 304 F.3d at 1134) ("In reviewing [plaintiff's] complaint to determine whether it should be dismissed under Rule 12(b)(6), the district court properly considered both the amended complaint and body camera footage that was attached to the motion to dismiss because the body camera footage was central to the amended complaint and was undisputed.")

The officers approached the back door of Ragland's apartment, and Henderson told Collum to stay at the back while Henderson went to the front door to make contact with Ragland. *Id*. at 8:42:13-8:42:20. Henderson knocked several times and said, "Hey Crystal, Huntsville police, can we talk to you real quick?" *Id*. at 8:42:20-8:42:26. Henderson then backed away and pointed his weapon at the door. *Id*. at 8:42:26-8:42:30.

Instead of answering the front door, Ragland went to the back door where she encountered Collum, who told Ragland to put her hands in the air. *Id*. at 8:42:30-8:42:32. Ragland said that she did not have a weapon, and Collum asked her to step outside onto the patio. *Id*. at 8:42:32-8:42:34. Ragland then asked, "Why are you pointing your weapon at me?" *Id*. at 8:42:34-8:42:35. Collum responded by telling Ragland twice to "get your hands up," and Ragland then told Collum to "shoot my fucking ass." *Id*. at 8:42:35-8:42:40.

Officer Henderson soon joined Officer Collum at the back door and told Ragland to "get your hands up" and "show us your other hand." *Id*. at 8:42:40-8:42:42. Unfortunately, Ragland reached her right hand towards her right pocket and grasped the handle of a pistol. *Id*. at 8:42:42-8:42:43; doc. 32, Exhibit C – Screenshots from Henderson's Bodycam Footage. The officers fired multiple shots at Ragland. Doc. 32-A at 8:42:43-8:42:45. After about thirty seconds, the officers moved Ragland from where she had fallen and cuffed her hands. *Id*. at 8:43:11-

6

8:43:21. About ninety seconds after that, Officer Henderson ran to his car to obtain a medical kit, and around three minutes after the shooting, the officers began administering first aid. Docs. 24 at ¶ 36; 32-A at 8:44:44-8:46:14; doc. 32, Exhibit B – Collum Bodycam Footage, at timestamp 8:44:57-8:46:04. Ragland died from her gunshot wounds. Doc. 24 at ¶ 30.

## III.

Robinson alleges that the officers and the City are liable under: (1) 42 U.S.C. § 1983 for using deadly force in violation of Ragland's Fourth Amendment rights (Count I); (2) Alabama's wrongful death statute, Ala. Code § 6-5-410, for negligently and wantonly causing Ragland's death (Count II); and (3) as to the City, *Monell* and its progeny for having an unconstitutional policy or custom of condoning excessive force used by its police officers (Count III). Doc. 24 at ¶¶ 59-84.

## A.

Robinson alleges in Count I that Officers Collum and Henderson, "while acting under color of law," used unconstitutionally excessive force against Ragland "with deliberate indifference and a callous disregard of Ragland's Fourth Amendment rights." Doc. 24 at ¶¶ 61, 63. She asserts that "Ragland did not pose an immediate threat of harm" to the officers and that "[n]o reasonably prudent

officer, faced with similar circumstances," would have shot and killed Ragland. *Id*. at ¶ 62.[3]

Section 1983 provides a vehicle for those who are deprived of their constitutional rights by persons acting under color of state law to pursue a claim for relief. *Torres v. Madrid*, 141 S. Ct. 989, 994 (2021). Relevant here, the Fourth Amendment guarantees the right of each person to be free from unreasonable searches and seizures, U.S. Const. amend. IV, and a police officer's use of deadly force is a seizure subject to the Fourth Amendment's reasonableness requirement, *Hunter v. City of Leeds*, 941 F.3d 1265, 1278-79 (11th Cir. 2019) (citing *Tennessee v. Garner*, 471 U.S. 1, 7 (1985)). Whether an officer's use of deadly force was reasonable turns on "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id*. at 1279 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

In analyzing the second *Graham* factor, the relevant question is "whether, given the circumstances, [the suspect] would have appeared to reasonable police officers to have been gravely dangerous." *Long*, 508 F.3d at 581 (quoting *Pace v.*

---

[3] Count I also includes a *Monell* claim against the City of Huntsville for a custom or practice of condoning unconstitutionally excessive force by its police officer. Doc. 24 at ¶¶ 64-67. This claim largely overlaps with Count III, and the court will address all of the plaintiff's *Monell* claims in section III(B) of this opinion.

*Capobianco*, 283 F.3d 1275, 1281 (11th Cir. 2002)). The Eleventh Circuit treats this factor as the most important, and the Circuit has held repeatedly that "where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officers or others, use of deadly force does not violate the Constitution." *Penley*, 605 F.3d at 851 (citing *Garner*, 471 U.S. at 11). Put differently, "[i]t is axiomatic that when an officer is threatened with deadly force, he may respond with deadly force to protect himself." *Hunter*, 941 F.3d at 1279.

A review of the amended complaint and the bodycam footage shows that Robinson has failed to plead sufficient facts to show a constitutional violation. In particular, as pleaded and as the bodycam shows, the officers could see the handle of a pistol protruding from Ragland's right pocket, and just before the officers opened fire, Ragland reached towards that pocket and appeared to grasp the handle of the weapon.[4] Robinson is correct that the officers did not wait for Ragland to draw her weapon, but the court must view the facts from the perspective of a reasonable officer at the scene. *Oliver v. Fiorino*, 586 F.3d 898, 906 (11th Cir. 2009). In light of the reports that Ragland had been waving a handgun at others, when she reached for and grasped the handle of her firearm, a reasonable officer,

---

[4] The complaint states that Ragland's gun was later determined to be inoperable, doc. 24 at ¶ 32, but Robinson acknowledges in her brief that this fact does not change the reasonableness analysis of the officers' use of force, doc. 41 at 10. *See, e.g., Penley*, 605 F.3d at 851 (noting that even though "the gun turned out to be a toy," the situation was not any less serious because reasonable officers would have believed it was real).

9

given the circumstances, could have believed that Ragland posed a threat of serious harm. Moreover, under the relevant caselaw, the officers were not required to wait until Ragland had "drawn a bead on the officer or others before using deadly force." *Thorkelson v. Marceno*, 849 F. App'x 879, 882 (11th Cir. 2021) (citing *Montoute v. Carr*, 114 F.3d 181, 185 (11th Cir. 1997)). As the Circuit has found, "[t]he law does not require officers in a tense and dangerous situation to wait until the moment a suspect uses a deadly weapon to act to stop the suspect." *Jean-Baptiste*, 627 F.3d at 821 (citing *Long*, 508 F.3d at 581). Therefore, because the video evidence shows Ragland reaching for her weapon prior to the officers opening fire, the second *Graham* factor weighs in favor of finding that the officers acted reasonably.

As to the first and third *Graham* factors, Officers Henderson and Collum were investigating complaints that Ragland was pointing a weapon at residents and behaving erratically, and when the officers made contact with Ragland, she failed to comply with the officers' commands to "get your hands up." Moreover, she reached towards her right pocket, where the handle of a pistol was visible to the officers. The seriousness of Ragland's initial conduct, along with her failure to follow the officers' commands, supports a finding of reasonableness also under the first and third factors outlined in *Graham*.[5]

---

[5] *Compare Fils v. City of Aventura*, 647 F.3d 1272, 1288 (11th Cir. 2011) (finding that use of force was unreasonable in part because "[d]isorderly conduct is not a serious offense" and the plaintiff "did not ignore any verbal instructions"), *with Penley*, 605 F.3d at 851 (holding that "[b]ringing a

Robinson may be correct that the officers' tactics escalated the situation. In particular, though Officer Henderson told the apartment manager that "we've got plenty of options and avenues we can explore" and that "obviously, we'll try and get [Ragland] some help," doc. 32-A at 8:41:09-8:41:14, Robinson asserts that the officers, with knowledge of Ragland's fragile mental health, made things worse by approaching her apartment with guns drawn and aimed at Ragland, doc. 41 at 8-10. Unfortunately, however, the court must judge the officers' actions "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Oliver*, 586 F.3d at 906 (internal citations omitted). And the Eleventh Circuit has suggested that an individual's mental instability weighs *in favor* of the reasonableness of deadly force. *Long*, 508 F.3d at 581. Critically, "it is [] constitutionally reasonable for an officer to use deadly force when he has probable cause to believe that his own life is in peril." *Robinson*, 415 F.3d at 1256.

The complaint and the bodycam footage show that Officers Henderson and Collum responded to a call about a person threatening her fellow tenants with a firearm, and they learned that Ragland had displayed repeated erratic behavior. When they observed Ragland reaching for her gun, they shot her. Even viewing the bodycam footage and the factual allegations in a light most favorable to the plaintiff,

---

firearm to school, threatening the lives of others, and refusing to comply with officers' commands to drop the weapon are undoubtedly serious crimes," and "non-compliance of this sort supports the conclusion that use of deadly force was reasonable").

11

precedent dictates that the officers acted reasonably under all three *Graham* factors and thus did not violate Ragland's Fourth Amendment rights. Accordingly, Robinson has failed to state a claim under 42 U.S.C. § 1983.[6]

**B.**

Robinson also alleges in Counts I and III that the City of Huntsville is liable under *Monell* and its progeny for (1) "a custom and practice that constituted a deliberate indifference to Ragland's constitutional rights that was the moving force behind [the officers'] unconstitutional and excessive use of deadly force," doc. 24 at ¶¶ 64-67, and (2) its "failure to establish a custom, policy, or practice regarding proper use of force," "specifically as it applies to mentally ill citizens," *id*. at ¶¶ 73-84. In support of her *Monell* claims, Robinson references a police officer who was convicted of murder for shooting and killing a man while responding to a 911 call. *Id*. at ¶¶ 18-25, 77-78. She argues that the endorsement of this officer's conduct by City officials shows that the City has, at the very least, an unofficial policy of condoning unconstitutionally deadly force. *Id*. at ¶¶ 64-67, 73-84.

---

[6] Since there is no constitutional violation, the court need not address the parties' arguments about qualified immunity. The court adds, however, that binding precedent supports the officers' position. *See, e.g., Kenning v. Carli*, 648 F. App'x 763, 770–71 (11th Cir. 2016) (citing *Perez v. Suszczynski*, 809 F.3d 1213, 1220 (11th Cir. 2016); *Mercado v. City of Orlando*, 407 F.3d 1152, 1154–57 (11th Cir. 2005)) (finding that officers were entitled to qualified immunity where decedent "had time to comply with [an officer's] command . . . but instead he defied the officer's command by turning back toward the gun lying in the open trailer doorway: a movement the officers reasonably perceived as threatening.")

Municipalities can be held liable under § 1983 for a deprivation of constitutional rights that is caused by a municipal custom, policy, practice, or usage, *see Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978); *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986), or by a failure to train police officers "that amounts to deliberate indifference to the [constitutional] rights of persons with whom the police come into contact," *City of Canton v. Harris*, 489 U.S. 378, 389 (1989).  To impose municipal liability under any of these theories, however, the plaintiff must first show a violation of her constitutional rights. *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004) (citing *Canton*, 489 U.S. at 388).  In that regard, even if Robinson is correct that the City has failed to train its officers on the proper use of force and how to interact with individuals with mental health concerns, and that the City has a policy or custom of condoning the use of deadly force in situations where such force is unconstitutionally unreasonable, where, as here, there is no underlying constitutional violation, the *Monell* claims also fail as a matter of law.  *See McDowell*, 392 F.3d at 1289.

## IV.

To close, two officers with the Huntsville Police Department shot and killed Crystal Ragland, a veteran suffering from PSTD who reached for a weapon during her encounter with the police.  In reflecting on this painful event and reviewing the legal claims of Ragland's representative, the court is bound by the case law

foreclosing a finding of a constitutional violation.  As such, the motions, docs. 30, 31, are due to be granted as to Counts I and III.  The court will decline to preside over the remaining claims which are pleaded under state law.  A separate order effectuating this opinion follows.

**DONE** the 15th day of October, 2021.

                                        **ABDUL K. KALLON**
                                    UNITED STATES DISTRICT JUDGE