UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

| | |
|---|---|
| **BRANDIE ROBINSON, as personal representative of the estate of Crystal Ragland, deceased,**     Plaintiff,<br><br>v.<br><br>**CITY OF HUNTSVILLE, et al.,**     Defendants. | Civil Action Number<br>**5:21-cv-00704-AKK** |

## MEMORANDUM OPINION AND ORDER

This case arose from Crystal Ragland's death at the hands of Huntsville police officers. Ragland, an Army veteran suffering from PTSD, was killed by officers who were responding to reports that Ragland had a gun and was pointing it at her neighbors. Doc. 48 at 4-7. Though the court dismissed plaintiff Brandie Robinson's lawsuit, *see id.* at 13-14, public interest in the shooting remains understandably high. Now before the court is AL.com's request for public access to bodycam footage filed in support of the defendants' motion to dismiss.[1] For the reasons stated below, the request is due to be granted.

---

[1] *See* Letter from Ashley Remkus, Investigative Reporter, Alabama Media Grp., to the undersigned (Oct. 26, 2021), which is attached herein as Exhibit 1.

## A.

In the early stages of this case, the parties jointly proposed a consent protective order which would permit the parties to designate materials as confidential prior to production. Doc. 7. The proposed order stipulated that "no materials designated as confidential shall be disclosed . . . to the media or otherwise published or disseminated," but provided that the parties could file a motion objecting to any confidentiality designation to bring the matter before the court. *Id*. at 5-6. The proposed order also allowed for its terms to be modified or limited "either by written agreement of the parties or by motion of any party for good cause shown." *Id*. at 8. The court adopted the parties' proposed order verbatim. Doc. 8.

Relying on this protective order, the defendants then moved for leave to file evidence – specifically, bodycam footage from the defendant officers who shot Ragland and a compilation of screenshots from the videos – under seal in support of their motion to dismiss. *See* docs. 28, 32. Robinson, the personal representative of Ragland's estate, objected:

> I understand that [unsealing the case] would allow evidence surrounding this death to be consumed by the public. I understand that some of this evidence including videos, audio, [and] written reports are extremely sensitive and graphic. However, I have weighed those concerns and believe it is clearly in the best interest of my family and the public interest for this case to be unsealed. We believe unsealing this case will ensure transparency and accountability in the pursuit of justice.

Docs. 29, 29-1.  In light of the then-pending motion to dismiss, the court temporarily granted the defendants' motion to file under seal, but promised to "revisit the issue after ruling on the motion to dismiss."  Doc. 35.  That time has now come.

**B.**

The defendants urge the court to maintain the confidentiality of the officers' bodycam footage despite AL.com's request.[2]  In support, they cite both the protective order itself and Alabama Code § 12-21-3.1(b), which maintains that law enforcement investigative materials, including bodycam footage, "are not public records" and "are privileged communications protected from disclosure."  Exhibit 2.  The court treats Robinson's previous objection, doc. 29, as a motion objecting to the confidentiality designation, and Robinson has responded in support of AL.com's request, *see* doc. 50.  Therefore, the issue of unsealing the footage is now properly before the court under the explicit terms of the protective order.  *See* doc. 8 at 2.[3]  And because the bodycam videos were filed in support of a substantive motion that required judicial resolution on the merits, and are therefore judicial records, this court is bound by the federal common law – not Alabama state law – in determining

---

[2] *See* E-mails from Greg Burgess, Att'y for Defendants, to the undersigned (Oct. 26, 2021, 16:18 CDT; Oct. 27, 2021, 14:00 CDT), attached herein as Exhibits 2 and 3.

[3] *See also F.T.C. v. AbbVie Prod. LLC*, 713 F.3d 54, 61 (11th Cir. 2013) (quoting *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 599 (1978)) ("District courts are in a superior position to decide whether to enter or modify protective orders, and it is well established that 'the decision as to access is one best left to the sound discretion of the trial court.'").

whether disclosure is proper. *See Comm'r, Alabama Dep't of Corr. v. Advance Loc. Media, LLC*, 918 F.3d 1161, 1167 (11th Cir. 2019).

### 1.

"The common-law right of access to judicial proceedings, an essential component of our system of justice, is instrumental in securing the integrity of the process." *Chicago Trib. Co. v. Bridgestone/Firestone, Inc.*, 263 F.3d 1304, 1311 (11th Cir. 2001). Accordingly, the media and public have a presumptive right to access judicial records. *Id*. This right is not absolute, and when deciding whether to withhold a judicial record from the public, the court must balance the competing interests of the parties to determine whether there is good cause to deny public access. *F.T.C. v. AbbVie Prod. LLC*, 713 F.3d 54, 62 (11th Cir. 2013). Among the relevant factors in this analysis are "whether the records are sought for such illegitimate purposes as to promote public scandal or gain unfair commercial advantage, whether access is likely to promote public understanding of historically significant events, and whether the press has already been permitted substantial access to the contents of the records." *Newman v. Graddick*, 696 F.2d 796, 803 (11th Cir.1983) (citing *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 598, 602-03, n.11 (1978)). In addition to these factors, "a judge's exercise of discretion in deciding whether to release judicial records should be informed by a sensitive appreciation of

the circumstances that led to the production of the particular [record] in question." *Chicago Tribune*, 263 F.3d at 1311 (citing *Nixon*, 435 U.S. at 598, 602-03).

**2.**

In their initial motion to file under seal, the defendants argued only that the bodycam footage contained "confidential and sensitive information that should not be shared with the general public." Doc. 28 at 2. The defendants now argue also that the "identities of the officers involved in this case—names and faces—are readily discernable from the [bodycam] videos," and that to "law enforcement officers routinely involved in police-citizen encounters and investigative assignments requiring anonymity and surprise, minimizing the public disclosure of officer identities is significant to job performance and personal safety." Exhibit 3. Thus, the defendants contend, "the release of these videos as proposed by AL.com could compromise the safety of the defendant officers and foreclose them from serving (or continuing to serve) in any undercover capacity now or in the future." *Id*.

In response, Robinson notes that the public already has considerable access to the contents of the bodycam footage via the court's memorandum opinion, including the identities of the officers, and that the "City of Huntsville has concluded its internal investigation and there are no other ongoing investigations into the matter at this time that would outweigh the public's need to have access to the contents of

5

the videos." Doc. 50 at 4-7. Robinson also references multiple examples of recent police misconduct in Huntsville and argues that "[g]iven the ongoing disputes regarding the matter of policing as it relates to mentally disabled in the City of Huntsville, the public has a right to be informed as to important matters of public concern." *Id*. at 10.

**3.**

Analysis of these legal arguments would not be complete without acknowledging their broader societal context. Crystal Ragland's killing, and this subsequent lawsuit and request for records, comes during a time of important reckoning in our country. To state the obvious, alleged systemic issues in policing are at the forefront of the public consciousness, sparked by countless instances of excessive force by police officers in recent years.[4] Particularly relevant to this case, African Americans and those experiencing mental health crises are victims of police violence at disproportionately high rates.[5] Because of this violence, community members, both nationally and here in Alabama, have organized to demand

---

[4] *See* Cheryl W. Thompson, *Fatal Police Shootings of Unarmed Black People Reveal Troubling Patterns*, NPR (Jan. 25, 2021), https://www.npr.org/2021/01/25/956177021/fatal-police-shootings-of-unarmed-black-people-reveal-troubling-patterns; Nicole Dungca et al., *A dozen high-profile fatal encounters that have galvanized protests nationwide*, Washington Post (June 8, 2020), https://www.washingtonpost.com/investigations/a-dozen-high-profile-fatal-encounters-that-have-galvanized-protests-nationwide/2020/06/08/4fdbfc9c-a72f-11ea-b473-04905b1af82b_story.html.

[5] *See Police Shootings Database*, Washington Post (Oct. 26, 2021), https://www.washingtonpost.com/graphics/investigations/police-shootings-database; *2020 Police Violence Report*, Mapping Police Violence (2020), https://policeviolencereport.org.

transparency and accountability in how law enforcement officers police their communities.[6]  Such transparency is crucial to maintaining trust in our criminal justice system and in our democratic society as a whole, especially because police use-of-force incidents are historically underreported or miscategorized by police departments.[7]  And because of the many doctrinal barriers that plaintiffs face in pursuing judicial remedies for alleged police misconduct,[8] public access to videos like those at issue here, even where there is no constitutional violation, is imperative to foster dialogue about whether structural reforms in policing are needed.

### 4.

The *Newman* factors weigh in favor of disclosure.  To begin, AL.com does not seek the bodycam footage for an illegitimate purpose, but instead requests access for the precise goal of "promot[ing] public understanding of historically significant events."  *Newman*, 696 F.2d at 803.  As Ashley Remkus writes in her request, "[u]se

---

[6] *See* Eliott C. McLaughlin, *How George Floyd's death ignited a racial reckoning that shows no signs of slowing down*, CNN (Aug. 9, 2020), https://www.cnn.com/2020/08/09/us/george-floyd-protests-different-why/index.html; Ashley Remkus, *Rubber bullets, tear gas, pepper spray: What happened in Huntsville through the eyes of protesters*, AL.com (June 8, 2020), https://www.al.com/news/2020/06/rubber-bullets-tear-gas-pepper-spray-what-happened-in-huntsville-through-the-eyes-of-protesters.html.

[7] *See* Tim Arango & Shaila Dewan, *More Than Half of Police Killings Are Mislabeled, New Study Says*, New York Times (Sept. 30, 2021), https://www.nytimes.com/2021/09/30/us/police-killings-undercounted-study.html; Rob Barry & Coulter Jones, *Hundreds of Police Killings Are Uncounted in Federal Stats*, Wall Street Journal (Dec. 3, 2014), https://www.wsj.com/articles/hundreds-of-police-killings-are-uncounted-in-federal-statistics-1417577504.

[8] *See generally* Sunita Patel, *Jumping Hurdles to Sue the Police*, 104 Minn. L. Rev. 2257 (2020).

of force has been of great public and political interest in Huntsville in 2021," following the murder conviction of another police officer "for the shooting of a suicidal man." Exhibit A. As to this case, Remkus states, "the public once again has a great interest in seeing the videos that show the operation of the city police department and what happened when officers Jonathan Henderson and Brett Collum encountered Crystal Ragland on May 30, 2019." *Id*. And, as Remkus notes, "[i]n the more than two years since [Ragland's death], public tax dollars have funded the litigation resulting from the fatal encounter, yet the public has been mostly kept in the dark." *Id*.

The court agrees that releasing the bodycam footage will allow the public to gain a better understanding of the officers' conduct, which is especially significant given the broader context in both Huntsville and the country at large. Moreover, since the court's memorandum opinion already discussed the events surrounding the shooting in detail, "the press has already been permitted substantial access to the contents of the records." *Newman*, 696 F.2d at 803. Indeed, local news coverage has already quoted portions of this retelling,[9] and the release of the footage itself thus does not implicate privacy concerns that weigh significantly against disclosure.

---

[9] *See* Ashley Remkus, *Judge dismisses lawsuit against Huntsville officers who shot and killed Crystal Ragland*, AL.com (Oct. 19, 2021), https://www.al.com/news/2021/10/judge-dismisses-lawsuit-against-huntsville-officers-who-shot-and-killed-crystal-ragland.html (quoting the court's memorandum opinion); *Judge dismisses lawsuit against Huntsville Police officers who killed Army veteran Crystal Ragland*, WHNT (Oct. 19, 2021), https://whnt.com/news/judge-dismisses-lawsuit-against-huntsville-police-officers-who-killed-army-veteran-crystal-ragland (same).

In sum, based on a sensitive appreciation of the circumstances and a balancing of the parties' interests, there is no good cause to deny public access to the bodycam footage in this case. *See AbbVie*, 713 F.3d at 62; *Chicago Tribune*, 263 F.3d at 1311. Therefore, because all three *Newman* factors weigh in favor of public access and such access is vital in an open democratic society – including for the scrutiny of judicial decisions dismissing cases alleging excessive force – AL.com's request is due to be granted.

### 5.

The defendants request alternatively that the court orders redaction of the defendant officers' identities because "the widespread dissemination and publication of their names, faces, voices, and other identifying characteristics over the internet . . . [is] a much larger and very specific threat to officer safety and privacy." Exhibit 3. The defendant officers were public officials acting under the authority of the City of Huntsville, and the footage depicts the officers performing their duties in a public space in front of multiple witnesses. As such, the officers' actions are rightfully the subject of public scrutiny, and their limited right to privacy in these actions does not override the public's right of access to the full contents of the footage. *See Toole v. City of Atlanta*, 798 F. App'x 381, 388 (11th Cir. 2019) (citing *Smith v. City of Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000)) (discussing diminished privacy expectations of police officers acting in their official capacity on matters of public

concern).[10, 11]  Therefore, because the officers are already named in the complaint and other court filings, and due to the importance of public access here, the court will decline the defendants' request.

### C.

Accordingly, the court's order temporarily granting the defendants' motion for leave to file evidence under seal, doc. 35, is **REVISED**, and the defendants are **ORDERED** to file exhibits A-C of their motion to dismiss, doc. 32, with the court by **November 5, 2021**, redacted only insofar as is necessary to remove identifying information of non-party individuals.  The defendants are also **ORDERED** to produce these exhibits to Brandie Robinson and AL.com by the same date.

---

[10] *See also Perez v. City of Fresno*, 482 F. Supp. 3d 1037, 1048-49 (E.D. Cal. 2020) (citing *In re Roman Cath. Archbishop of Portland in Oregon*, 661 F.3d 417, 425 (9th Cir. 2011)) (denying request to blur non-party ambulance employees' faces in wrongful death lawsuit where (1) disclosure of bodycam footage was proper under a common law analysis and (2) the non-party employees were acting in a public capacity alongside the defendant police officers); *Sampson v. City of El Centro*, 2015 WL 11658713, at *7 (S.D. Cal. Aug. 31, 2015) (permitting release of bodycam footage, despite privacy interests weighing against disclosure, where non-parties' identities were redacted from the relevant videos and photographs).

[11] The Alabama Supreme Court, albeit it in a different context, has similarly held that "the right to privacy does not prohibit the broadcast of matter that is of legitimate public or general interest, [and] [t]his concept is based upon the rationale that a right of action for invasion of privacy must give way to the interest of the public in being informed." *McCaig v. Talladega Pub. Co.*, 544 So. 2d 875, 879–80 (Ala. 1989) (internal citations omitted).  And, as the Court put it in another case, "the white light of publicity safeguards the public[,] and free disclosure of truth is the best protection against tyranny." *Smith v. Doss*, 37 So. 2d 118, 120 (Ala. 1948).

**DONE** the 1st day of November, 2021.

                                            _____
                                            **ABDUL K. KALLON**
                                         UNITED STATES DISTRICT JUDGE